IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Tracy Maria Quarles, | ) | C/A No.: 1:13-2521-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On July 14, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on March 28, 2007. Tr. at 148–53, 154–57. Her applications were

denied initially and upon reconsideration. Tr. at 103–04, 114–15, 116–17. On February 28, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Maria C. Northington. Tr. at 32–88 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 4, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 16, 2013. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 35. She completed the eleventh grade. Tr. at 42. Her past relevant work ("PRW") was as a cutter machine operator and a glove turner and former. Tr. at 73–74. She alleges she has been unable to work since March 28, 2007. Tr. at 35.

2.    Medical History

Plaintiff presented to Jessica Inwood, M.D., on February 8, 2007, complaining of cramps in her hands and feet and a pins-and-needles sensation in her left hand. Tr. at 707–08. Dr. Inwood noted decreased sensation in Plaintiff's feet, negative Tinel's sign, and positive Phalen's sign. Tr. at 710. Plaintiff indicated that she had been out of medication for a month, and Dr. Inwood instructed her to restart her medications. Tr. at 708, 711.

On April 28, 2007, Plaintiff presented to Chandler Todd, M.D., complaining of left-sided muscle spasms and pain after being hit by a car in a parking lot. Tr. at 702. She also indicated that her blood sugar was elevated. *Id.* Dr. Todd noted tenderness to palpation over Plaintiff's deltoid, trapezius, quadriceps, and calf musculature. Tr. at 704.

Plaintiff presented to Dr. Inwood on April 3, 2007. Tr. at 696. She was experiencing headaches and acute vomiting. Tr. at 700. CT scan of her head was normal. *Id.* Plaintiff had decreased range of motion in her left upper and lower extremities. Tr. at 699.

On April 12, 2007, Plaintiff followed up with Dr. Inwood regarding headaches, neck pain, left hip pain, shoulder pain, and elevated blood sugar. Tr. at 690. Plaintiff reported left neck spasms and requested a referral for physical therapy. Tr. at 691.

Plaintiff followed up with Dr. Inwood on May 4, 2007, complaining of headaches and pain on her left side and in her neck, bilateral arms, right leg, and left shoulder. Tr. at 684–85. She indicated she required help to put on her shirt and had difficulty opening bottles and jars due to hand weakness. *Id.* Dr. Inwood noted she was "[o]n short-term disability, appropriately so." *Id.* She observed tenderness to palpation over Plaintiff's occipitals; muscle spasms in her bilateral trapezius musculature; bilateral lumbar paraspinal muscle spasms; some mild tenderness to palpation over her right lateral epicondyle; decreased range of motion of her left shoulder; positive impingement sign; weakness on supraspinatus testing and lift-off test for subscapularis; and tenderness to palpation over her lower back and sciatic notch. Tr. at 687. She also noted that Plaintiff's mood was mildly depressed. *Id.*

Plaintiff presented to Dr. Inwood for a recheck on June 5, 2007. Tr. at 679. She complained of left arm pain, left hip pain, uncontrolled diabetes, and peripheral neuropathy. *Id.* Dr. Inwood observed antalgic gait, weakness on abduction and decreased range of motion of the left upper extremity, tenderness to palpation over the left buttock, and positive straight-leg raise. Tr. at 682. She also noted that Plaintiff's mood was mildly depressed. *Id.*

Plaintiff followed up with Dr. Inwood on June 21, 2007, complaining of muscle spasms, occipital headache, and neck tightness. Tr. at 673. Dr. Inwood noted moderately decreased range of motion in Plaintiff's head and neck, some mild tenderness to palpation over her lateral epicondyle, weakness on abduction of her left upper extremity, and decreased range of motion of her left upper extremity. Tr. at 676. She referred Plaintiff to physical therapy. *Id.* Dr. Inwood also noted carpal tunnel syndrome and instructed Plaintiff to use a splint and to continue taking Nortryptiline. Tr. at 677.

On July 18, 2007, Plaintiff complained to Clayton H. Davis, M.D., of muscle spasms in her neck and pain on the left side of her body. Tr. at 668. Dr. Davis observed paravertebral muscle spasms and decreased range of motion in Plaintiff's head and neck. Tr. at 671. He suggested that Plaintiff's pain was likely increased due to overuse in physical therapy and prescribed Lortab for pain. *Id.*

Plaintiff attended a counseling session on July 19, 2007, with Nancy Voight, Ph.D. Tr. at 667. Plaintiff reported nightmares, flashbacks, reduced sleep, increased irritability, intermittent depression, sudden and rather violent anger outbursts, anxiety attacks with and without nausea and lightheadedness, ideas of reference, social isolation, avoidance of

crowds, assaultive ideation, and irrational generalized anxiety. *Id.* She also reported crying spells occurring twice a day and lasting for 10 to 15 minutes and a reduction in concentration. *Id.*

Plaintiff followed up with Gayathri K. Kumar, M.D., on July 23, 2007, complaining of significant left-sided pain that worsened with walking and improved with lying down. Tr. at 662.

On August 27, 2007, Plaintiff presented to Martin Johns, M.D., for a recheck of her left shoulder. Tr. at 657. She complained of constant shoulder pain and chronic headaches. Tr. at 657. Plaintiff was diagnosed with chronic migraine, and Dr. Johns prescribed Topamax. Tr. at 660. Dr. Johns indicated that he was continuing current pain medications and physical therapy for Plaintiff's shoulder. *Id.* He expressed some concern regarding secondary gain and Plaintiff's desire to avoid a return to work. *Id.*

Plaintiff presented to Dr. Kumar on October 5, 2007, for a recheck of left-sided pain. Tr. a 652. Dr. Kumar noted left upper extremity motor strength to be slightly decreased at 4/5. Tr. at 655. He referred Plaintiff to physical therapy and instructed her to attend all appointments. *Id.*

On November 6, 2007, Plaintiff presented to Dr. Johns with complaints of pain on her left side and edema in her feet and legs. Tr. at 647. She also indicated that she was experiencing daily headaches, but she had not received her prescriptions through the medication assistance program. *Id.* Dr. Johns noted 2+ edema in Plaintiff's calves. Tr. at 650. Dr. Johns indicated that Plaintiff was restarting physical therapy, but he was concerned about secondary gain from her complaints of left shoulder pain. Tr. at 650–51.

On February 14, 2008, Plaintiff complained to Dr. Kumar of muscle spasms and left shoulder pain. Tr. at 636. Dr. Kumar observed slightly decreased left upper extremity strength of 4/5. Tr. at 639. Dr. Kumar indicated Plaintiff had undergone physical therapy several times for her left shoulder pain. *Id.* He further indicated that there was a question of secondary gain and that he would refer Plaintiff to a pain clinic. *Id.*

Plaintiff followed up with Dr. Kumar on March 20, 2008, reporting that her blood sugars ranged from 300 to 500. Tr. at 632. Dr. Kumar increased Plaintiff's dosage of Novolog to 26 units and increased Metformin to 1000 mg, twice a day. Tr. at 634.

Plaintiff presented to Alex Duvall, M.D., on April 3, 2008, complaining that her feet and legs were swelling. Tr. at 628. Dr. Duvall noted 2+ bilateral pitting edema. Tr. at 629. He prescribed Lasix to reduced Plaintiff's fluid retention. Tr. at 630.

On April 21, 2008, Plaintiff followed up with Dr. Kumar regarding lower extremity edema. Tr. at 624. She indicated that Lasix was not working, but that her edema was reduced by elevating her feet. *Id.* Plaintiff's average blood sugar was noted to be 350. *Id.* Dr. Kumar observed 2+ pitting edema, worse on the left than on the right. Tr. at 625. He changed Plaintiff's Lantus dosage to 65 units, twice a day. Tr. at 626.

Plaintiff presented to Dr. Kumar to follow up on her diabetes on May 13, 2008. Tr. at 621. Dr. Kumar indicated she was eating a lot of sugar. *Id.* Plaintiff complained of mild bilateral leg edema, and Dr. Kumar recommended compression stockings. Tr. at 623.

On June 18, 2008, Plaintiff followed up with Dr. Kumar regarding diabetes. Tr. at 618. She complained of blood sugars running between the 300s and 400s, but stated she

had been compliant with dietary recommendations. *Id.* Dr. Kumar increased her dosage of Lantus to 70 units, twice a day. Tr. at 620.

Plaintiff presented to Dr. Kumar on July 30, 2008, complaining of a recent increase in blood sugar levels, which she attributed to increased stressors. Tr. at 615. Dr. Kumar increased her Lantus dosage to 80 units, twice a day. Tr. at 617.

On November 13, 2008, Plaintiff complained to Dr. Kumar of right foot pain, elevated heart rate, and elevated blood sugars. Tr. at 613. Dr. Kumar indicated her diet was poorly-controlled and she did not exercise. *Id.* He observed decreased sensation in Plaintiff's feet. *Id.* He increased Plaintiff's Lantus dosage to 90 units, twice a day. Tr. at 614.

On December 4, 2008, Plaintiff followed up with Dr. Kumar. Tr. at 611–12. Plaintiff's dietary compliance was noted to be poor, and she had extensive sensory loss in her feet. Tr. at 611. She was instructed to increase her dinner time dosage of Novolog to 30 units initially and by two additional units every three days until her bedtime blood sugar was less than 150. Tr. at 612.

Plaintiff presented to Daniel Y. Patten, M.D., on February 2, 2009, complaining of numbness and a pins-and-needles sensation in her right foot, palpitations, and dizziness. Tr. at 608. Dr. Patten noted Plaintiff had extensive sensory loss in her feet, especially medially. *Id.* He diagnosed plantar fasciitis. Tr. at 609.

On June 29, 2009, Plaintiff followed up with Dr. Kumar. Tr. at 599–602. Her diabetes was poorly controlled and Novolog was increased to 34 units. Tr. at 600.

Plaintiff presented to Daniel Pike, M.D., on July 1, 2009, for a recheck of her toes. Tr. at 319. She complained of pain in her toes and bilateral leg edema. *Id.* Dr. Pike observed 1+ edema in Plaintiff's bilateral lower extremities to the mid-calf area. *Id.* Dr. Pike prescribed Lasix 20 mg daily. Tr. at 320.

On September 14, 2009, Plaintiff complained to Dr. Pike that she had been out of medication for a month due to difficulties in obtaining her prescriptions. Tr. at 312. Plaintiff also complained of episodes of chest pain and bilateral lower extremity edema. Tr. at 312. Decreased sensation was noted in Plaintiff's left foot and she had 1+ pitting edema in her ankle. *Id.*

Plaintiff presented to Michael Croitoru for a cardiology consultation on October 30, 2009. Tr. at 279–81. She indicated her heart rate was fast and her endurance was diminished. Tr. at 279. She reported recent edema. *Id.* Dr. Croitoru assessed exertional angina, abnormal cardiovascular function study, diabetes mellitus, hypercholesterolemia, benign hypertension, and rapid heartbeat. Tr. at 281.

On December 1, 2009, Plaintiff's blood pressure was increased and she reported high blood sugars, but denied dietary non-compliance. Tr. at 307. Dr. Pike observed Plaintiff to have normal gait, but noted decreased sensation in her feet. *Id.*

Plaintiff followed up with Dr. Pike on December 15, 2009, complaining of worsening left hip and leg pain. Tr. at 305. She indicated that she experienced baseline pain in the area, but it had recently worsened and was exacerbated by sitting or standing for prolonged periods. *Id.* Plaintiff's gait was described as antalgic and favoring the left leg, but examination was otherwise normal. *Id.* Plaintiff was diagnosed with sciatica and

8

prescribed a four-day dose of Prednisone. Tr. at 305–06. She was also prescribed a Novolog Flexpen 100 unit/mL solution to be administered as 35 units before breakfast, 35 units before lunch, and 30 units before dinner. Tr. at 306.

Plaintiff underwent colonoscopy on January 8, 2010, which indicated microcytic anemia and internal hemorrhoids. Tr. at 432–33. A 5 mm colon polyp was discovered and removed. Tr. at 433.

On January 15, 2010, Plaintiff complained of worsened left leg pain to Dr. Pike. Tr. at 302. She indicated that the leg pain had been a problem off and on for two to three years and that a neurologist had performed nerve studies and diagnosed sensorimotor neuropathy. Id. Dr. Pike prescribed Neurontin 300 mg, three times daily. Tr. at 303.

Plaintiff followed up with Dr. Croitoru on January 25, 2010. Tr. at 269–70. Dr. Croitoru noted considerable improvement in Plaintiff's energy and stamina with less dyspnea. Tr. at 269. She complained of bursts of palpitations that occurred frequently and were worsened by exertion. Id. Dr. Croitoru recommended a Holter monitor and blood work. Id. He suggested an esophagogastroduodenoscopy ("EGD") if Plaintiff's hemoglobin remained low. Id.

Plaintiff participated in a sleep study on January 25, 2010. Tr. at 324–25. The study revealed no evidence of sleep apnea or other significant abnormalities. Tr. at 325.

Plaintiff followed up with Dr. Pike on February 15, 2010, and reported some improvement in her left sciatica after restarting Neurontin. Tr. at 300. He changed Plaintiff's medication dosages to include Lantus Solostar 100 unit/mL solution to be administered as 96 units, twice a day; Nortriptyline HCL 25 mg to be administered as one

capsule, twice a day; and Neurontin 300 mg to be administered as two in the morning, one at noon, and two at night. Tr. at 301.

On March 5, 2010, Plaintiff followed up on diagnostic testing with Dr. Croitoru. Tr. at 257–59. The Holter monitor indicated sinus rhythm and sinus tachycardia, which was determined to be an exaggerated response to exercise consistent with Plaintiff's diagnosed anemia. Tr. at 257. The EGD showed ulcers, reflux, and chronic small intestine inflammation, but was negative for malabsorption and H. pylori. *Id.* Plaintiff complained of palpitations, moderate chest pressure, and loss of appetite. *Id.* Dr. Croitoru assessed diabetes mellitus, hypercholesterolemia, hypertension with good control, and iron deficiency anemia with slow response to iron supplementation. Tr. at 258–59.

On March 16, 2010, Plaintiff complained to Dr. Pike that she was experiencing fatigue and had decreased appetite. Tr. at 297. Her father had passed away two weeks earlier, and she was depressed. *Id.* She indicated that she was taking half of her regular dose of insulin because of her decreased food intake, but that her blood sugar was still greater than 400 at times. *Id.* Dr. Pike indicated that Plaintiff's fatigue was likely an acute grief reaction. *Id.* He encouraged Plaintiff to make good dietary choices and to take Lantus as prescribed unless she was not eating. Tr. at 296.

Plaintiff visited Dr. Pike on April 5, 2010, complaining of elevated blood sugar, peripheral edema, joint pain, weakness, and paresthesias. Tr. at 295. Dr. Pike noted 1+ edema of Plaintiff's bilateral lower extremities to the mid-shin area and a seven-pound weight gain over several days. Tr. at 295–96. Plaintiff was instructed to increase her

Lantus dosage to 96 units twice a day and to increase her Lasix prescription to twice a day. Tr. at 296.

On May 4, 2010, Plaintiff saw Dr. Pike for her chronic medical problems and a new complaint of left knee pain. Tr. at 293. Dr. Pike noted severe peripheral neuropathy in Plaintiff's feet and that her diabetes was uncontrolled. *Id.* Plaintiff demonstrated patellar grind and mild tenderness to palpation in her left knee, but her physical examination was otherwise normal. Tr. at 294. Dr. Pike suggested that there was likely some element of dietary non-compliance because Plaintiff's A1C remained elevated on 300 units of insulin daily. *Id.*

An x-ray of Plaintiff's left knee on May 4, 2010, was essentially negative, but showed some possible early joint space narrowing in the medial compartment. Tr. at 292.

On May 17, 2010, Plaintiff presented to Dr. Pike for a recheck of diabetes mellitus. Tr. at 290. Dr. Pike observed Plaintiff's blood sugar to have decreased when she kept a detailed dietary log, which led him to believe she had some dietary noncompliance. Tr. at 291. Left sciatica was noted to be improved, but Plaintiff still complained of some symptoms. *Id.*

Plaintiff presented to Dr. Pike on May 24, 2010, complaining that her headaches had recently worsened. Tr. at 288. She also complained of transient paralysis, weakness, and paresthesias. Tr. at 289. Plaintiff's left upper and lower extremity strengths were slightly reduced at 4/5. *Id.* Decreased coordination was noted more on the left than on the right. *Id.* Dr. Pike administered a Toradol injection and indicated that Plaintiff's symptoms were consistent with a transient ischemia attack ("TIA"). *Id.*

11

On June 2, 2010, Plaintiff presented to Self Regional Healthcare with a headache. Tr. at 519.

On July 7, 2010, Plaintiff followed up with Gary Goforth, M.D. Tr. at 284–87. She complained of difficulty controlling her diabetes since running out of Lantus. Tr. at 284. Plaintiff indicated her blood sugars had been running high, but she was working to improve diet and to exercise regularly and had lost six to eight pounds. *Id.* Plaintiff complained of right shoulder bursitis. *Id.* Dr. Goforth noted trace bilateral lower extremity edema and some decreased sensation in Plaintiff's bilateral feet. Tr. at 286.

Dr. Pike completed a form on August 10, 2010, regarding Plaintiff's mental status. Tr. at 526. He indicated that Plaintiff was diagnosed with major depression, was prescribed Cymbalta 60 mg, had not been recommended for psychiatric care, was properly oriented, had intact thought process, appropriate thought content, normal overall mood/affect with depressed mood/affect at times, adequate attention/concentration, adequate memory, and exhibited no work-related limitation in function due to the mental condition. *Id.*

Plaintiff complained to Dr. Pike of foot pain, numbness, and pin-prick sensation on August 13, 2010. Tr. at 549. Dr. Pike noted decreased sensation in Plaintiff's bilateral feet. Tr. at 551. He assessed diabetic peripheral neuropathy and suggested that it was likely due to poor glycemic control. *Id.*

On August 26, 2010, state agency medical consultant Steven Fass, M.D., completed a physical residual functional capacity assessment in which he indicated that Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift

and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull unlimited; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; occasionally climb ladders/ropes/scaffolds; avoid concentrated exposure to extreme cold and extreme heat; and avoid even moderate exposure to hazards. Tr. at 527–34.

Also on August 26, 2010, Robbie Ronin, Ph.D., completed a psychiatric review technique in which he considered affective disorders and concluded that Plaintiff's impairments were not severe. Tr. at 535. He determined that Plaintiff had no restriction of activities of daily living, no difficulties in maintaining social functioning, and no periods of decompensation. Tr. at 545. He noted Plaintiff had mild difficulties in maintaining concentration, persistence, or pace. *Id.*

Plaintiff followed up with Dr. Pike on December 21, 2010. Tr. at 552. She reported borrowing her brother's medication because she could not afford her own. *Id.* She indicated her blood sugar was uncontrolled even though she reduced her carbohydrate intake and continued to lose weight. *Id.* She also complained of bilateral leg pain and nerve pain in her buttocks. *Id.* Dr. Pike stated he was baffled as to why Plaintiff's blood sugar was high if she was taking her medication as prescribed, but that he suspected noncompliance. Tr. at 555.

On January 12, 2011, Plaintiff followed up with Dr. Pike. Tr. at 556. Plaintiff complained of uncontrolled blood sugar in spite of weight loss and Dr. Pike noted that she had lost seven pounds since September 2010. *Id.* Dr. Pike indicated that Plaintiff was

likely either eating more than her insulin could control or not taking her insulin correctly. Tr. at 559.

Plaintiff presented to Robert Briggs, M.D., on January 20, 2011, reporting poor diabetes control. Tr. at 560. She stated she ran out of insulin the previous Friday and experienced abdominal pain and fatigue over the weekend. Tr. at 564. Dr. Briggs discontinued Lantus Solostar and replaced it with Insulin Purified NPH, 50 units twice a day. Tr. at 563. Plaintiff followed up with Dr. Pike the next day and he discontinued the Insulin Purified NPH and prescribed Humulin N 100, 50 units twice a day. Tr. at 566.

On February 9, 2011, Plaintiff complained to Dr. Pike of back pain and shoulder pain. Tr. at 568. She indicated she was checking her blood sugar three times daily and that it was running in the 200s to 400s. *Id.* She stated she was taking insulin, but was not taking Novolog frequently because of her lack of appetite. *Id.* Dr. Pike indicated that Plaintiff's low back pain seemed to be musculoskeletal in origin. Tr. at 570.

On March 9, 2011, Plaintiff complained to Dr. Pike that she was unable to obtain insulin and her blood sugars were in the 300s to 400s. Tr. at 791. Dr. Pike observed markedly decreased sensation in the sole of Plaintiff's left foot with an inability to feel anything but her third digit. Tr. at 793. He also noted Plaintiff had markedly decreased sensation in the sole of her right foot and over the midfoot. *Id.* He advised Plaintiff to obtain insulin. *Id.*

State agency consultant Craig Horn, Ph.D., completed a psychiatric review technique on March 10, 2011, in which he considered affective disorders, but concluded Plaintiff's psychiatric impairment was not severe. Tr. at 572–84. He assessed Plaintiff to

have mild difficulties in maintaining concentration, persistence, or pace, but no restriction of activities of daily living, difficulties in maintaining social functioning, or episodes of decompensation. Tr. at 582.

On March 22, 2011, state agency medical consultant Seham El-Ibiary completed a physical residual functional capacity assessment in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; push and/or pull limited to frequent use of left foot; occasionally climbing ladders/ropes/scaffolds; frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and avoid concentrated exposure to hazards. Tr. at 586–93.

Plaintiff followed up with Dr. Pike on April 15, 2011, complaining of bilateral shoulder and arm pain. Tr. at 787. She also reported poor diabetes control with blood sugars routinely ranging from the 300s to 400s and rarely being in the 200s or less. Tr. at 787. Plaintiff indicated she was doing poorly and had recently gained eight pounds. *Id.* Dr. Pike observed tenderness to palpation in Plaintiff's left shoulder acromion/acromioclavicular ("AC") joint and deltoid muscle, and limited flexion and abduction. Tr. at 789. Plaintiff also had decreased muscle strength. *Id.* X-rays of Plaintiff's cervical spine and left shoulder were unremarkable. Tr. at 790.

On April 29, 2011, Plaintiff reported to Harvey Hatcher, M.D., that her diabetes was poorly controlled. Tr. at 784. Dr. Hatcher observed tenderness to palpation over

Plaintiff's left shoulder acromion/AC joint and very limited range of motion. Tr. at 786. He diagnosed subacromion bursitis on the left. *Id.*

Plaintiff complained to Dr. Pike on May 26, 2011, that she had had been out of insulin for a week and that her blood sugar was running over 600. Tr. at 781. Dr. Pike noted that Plaintiff's financial situation limited her ability to comply with her diabetic treatment and she could not afford insulin. *Id.* Plaintiff reported paresthesias and feeling poorly. *Id.* Plaintiff was instructed to register at United Ministries immediately and to return that night for Lantus and Novolog prescriptions. Tr. at 783.

Plaintiff followed up with Dr. Pike on June 15, 2011. Tr. at 777. Plaintiff stated that she had been following her diet, but her blood sugars were running in the 400s. Tr. at 777. Plaintiff's blood sugar was greater than 600 during her office visit. Tr. at 779. She was noted to be on 175 units of insulin per day. Dr. Pike arranged for Plaintiff to be admitted to the hospital. *Id.*

On June 23, 2011, Plaintiff followed up with Nancy Wicker, M.D., after her hospitalization. Tr. at 774. Dr. Wicker noted that Plaintiff's diabetes seemed to be better controlled and that her diabetic peripheral neuropathy was improved with Neurontin. Tr. at 776.

Plaintiff presented to Dr. Wicker for diabetes follow up on July 14, 2011, reporting that her blood sugars ranged from 200 to 450 and that she had not yet received her Lantus prescription through the prescription assistance company Wellvista. Tr. at 770. Plaintiff complained of worsening lower extremity edema. *Id.* Dr. Wicker emphasized the importance of Plaintiff obtaining the Lantus, but prescribed a higher dose

16

of Novolog, a short-acting insulin, to provide some improvement until Plaintiff could receive her prescription for Lantus from Wellvista. Tr. at 772–73.

Plaintiff followed up with Dr. Wicker regarding her diabetes on August 4, 2011. Tr. at 767. Plaintiff indicated that she felt better and denied having nausea and abdominal pain. *Id.* She brought a journal of her blood sugars, which were all in the 200s to 300s. *Id.* Plaintiff was advised to increase her dosage of Lantus by two units every other day until her morning blood sugars were between 80 and 120. Tr. at 769.

Plaintiff complained to Nicole Kennedy, M.D., of right shoulder pain on August 19, 2011. Tr. at 762. Dr. Kennedy noted tenderness to palpation of the right shoulder, painful movement, decreased range of motion, and normal strength. Tr. at 765. Plaintiff also had limited range of motion in abduction and internal rotation of the left shoulder. *Id.*

On August 24, 2011, Plaintiff saw Trey Moore, M.D., regarding sudden onset of sharp bilateral shoulder pain. Tr. at 757. Dr. Moore noted that Plaintiff experienced pain with range of motion of the bilateral shoulders and demonstrated decreased strength. Tr. at 760.

Plaintiff presented to Dr. Wicker on September 1, 2011, for routine follow up. Tr. at 753. Dr. Wicker indicated that Plaintiff's diabetes symptoms were improving. Tr. at 756.

Plaintiff presented to Robert Ulrich, M.D., on September 16, 2011, complaining of bilateral shoulder pain. Tr. at 748. Dr. Ulrich observed significantly impaired bilateral

shoulder abduction. Tr. at 751. Dr. Ulrich prescribed Ultram and continued Plaintiff's prescription for Gabapentin. *Id.*

On September 28, 2011, Plaintiff reported improvement in blood sugar with use of Lantus. Tr. at 743. Dr. Kennedy noted that Plaintiff was taking 42 units of Lantus, four times daily, as well as 15 units of Novolog with meals. *Id.* Dr. Kennedy observed diffuse tenderness to palpation in Plaintiff's bilateral shoulders and decreased range of motion in all directions. Tr. at 746. She also noted diminished tactile sensation with monofilament testing throughout both feet. *Id.* Plaintiff was instructed to increase her supper time dose of Novolog to 20 units. *Id.*

Plaintiff presented to Christopher Sperry, M.D., on October 27, 2011, for routine follow up. Tr. at 734. Dr. Sperry noted decreased monofilament sensation in Plaintiff's bilateral feet. Tr. at 737. He increased Plaintiff's dosage of Lantus to 45 units at bedtime. *Id.*

On November 7, 2011, Plaintiff complained to Dr. Wicker that she ran out of insulin and her morning blood sugars were registering in the 300s. Tr. at 730. She also complained of problems with left shoulder range of motion. *Id.* Dr. Wicker instructed Plaintiff to increase her morning dose of insulin by 2 units every other day until her morning blood sugar was between 80 and 120. Dr. Wicker noted that Plaintiff would benefit from a steroid injection in her left shoulder, but indicated she was unable to administer an injection until after her blood sugars were better controlled. Tr. at 733.

Plaintiff followed up with Dr. Wicker on November 14, 2011, complaining of elevated glucose accompanied by tiredness and confusion. Tr. at 726. Her blood sugar was markedly elevated. Tr. at 728.

On December 2, 2011, Dr. Wicker provided a medical source statement in which she indicated she had treated Plaintiff for roughly a year and that she diagnosed Plaintiff with peripheral neuropathy, poorly-controlled diabetes mellitus, diastolic congestive heart failure, and adhesive capsulitis. Tr. at 595. She noted Plaintiff experienced pain, paresthesias, abnormal gait, weakness, cramping and burning in her calves and feet, and chronic fatigue. *Id.* She indicated that Plaintiff experienced moderate pain in her bilateral lower extremities. *Id.* She did not note any side effects of medications or need for an assistive device. *Id.* Dr. Wicker indicated that Plaintiff had significant limitations with reaching, handling, and fingering and experienced pain/paresthesias and muscle weakness in her upper extremities. *Id.* She suggested Plaintiff could use her bilateral hands to grasp, turn and twist objects during 50 percent of an eight-hour day; could use her fingers for fine manipulation during 70 percent of an eight-hour day; could use her arms for forward reaching during 50 percent of an eight-hour day; and could use her arms for overhead reaching during 25 percent of an eight-hour day. Tr. at 596. Dr. Wicker indicated that Plaintiff was incapable of working an eight-hour day, 40 hours per week, but could work approximately 20 hours per week. *Id.* She noted Plaintiff would require approximately three unscheduled breaks lasting about 20 minutes each, due to pain, fatigue, and nausea. *Id.* Dr. Wicker indicated that Plaintiff could sit for more than two hours at one time; could stand for 30 minutes at a time; could stand/walk for about two

hours during an eight-hour workday; and could sit for at least 6 hours during an eight-hour workday. *Id.* She noted Plaintiff needed the ability to shift positions at will from sitting, standing, or walking. Tr. at 597. She indicated Plaintiff could lift 10 pounds occasionally and frequently, could walk for one block without rest, and could bend, stoop, and balance. *Id.* She classified Plaintiff's pain as moderate and indicated it would cause her to be off task approximately 10 percent of the time. *Id.* Dr. Wicker suggested Plaintiff elevate her legs at a level perpendicular with her body for 20 percent of an eight-hour workday. *Id.* She stated Plaintiff was capable of low stress work, likely to have good and bad days, and anticipated to be absent from work more than four days per month. *Id.*

Plaintiff presented to Dr. Wicker on December 13, 2011, complaining of neck and shoulder pain. Tr. at 718. She noted some improvement in Plaintiff's blood sugar readings. *Id.* Dr. Wicker encouraged Plaintiff to return to physical therapy and to work on her strength and mobility at home. Tr. at 721.

Plaintiff followed up with Dr. Wicker on January 10, 2012. Tr. at 713. She complained of intermittent chest pain accompanied by shortness of breath and mild nausea. *Id.* Dr. Wicker observed trace pitting edema in Plaintiff's bilateral ankles. Tr. at 716. She noted that Plaintiff's chest pain sounded typical of unstable angina, prescribed Nitroglycerin, and referred Plaintiff for an exercise test. *Id.* Dr. Wicker also noted that Plaintiff had been skipping doses of Lantus and advised her to take her medication as prescribed. Tr. at 717.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on February 28, 2012, Plaintiff testified that she was five feet, three inches tall and weighed 193 pounds. Tr. at 38. She stated she was right handed. *Id.* Plaintiff indicated she had been divorced for over five years. *Id.* She testified she lived in a mobile home with her adult son. Tr. at 39. Plaintiff had a driver's license, but she no longer drove. *Id.*

Plaintiff testified that her ex-husband, Floyd Quarles ("Mr. Quarles"), drove her to the hearing and they stopped three times during the one hour and fifteen minute trip for her to stretch her legs. Tr. at 39–40.

Plaintiff stated she injured her shoulders and neck when she was hit by a car in March 2007 while walking toward a gate at the plant where she was employed. Tr. at 41, 57–58, 61. She stated her feet felt like they were being stabbed with a knife and became worse when she stood. Tr. at 62.

Plaintiff testified she was diagnosed with diabetes approximately 18 years earlier and followed a diabetic diet. Tr. at 46. She took insulin and pills. Tr. at 47. Her blood sugar was recently elevated and she indicated that stress caused her blood sugar to increase. *Id.*

Plaintiff testified she was prescribed medication for her heart and was supposed to follow up with a cardiologist, but she could not afford the medication or the doctor's visit. Tr. at 50. Plaintiff indicated she experienced chest pain once a week. *Id.*

21

Plaintiff testified that she took medication for hypertension and it controlled her symptoms. Tr. at 51. She took pain medication for her right shoulder and had previously participated in physical therapy. *Id.* She testified she was unable to take steroids for her shoulder because they increased her blood sugar. Tr. at 52. She took Cymbalta for depression and found it helpful. Tr. at 53.

Plaintiff testified that she was unable to work because her medications made her drowsy and sleepy. Tr. at 54. She indicated she may sleep for eight hours after taking her nerve medication. Tr. at 63. She stated she was in constant pain. Tr. at 55. She stated she had pain in her neck, shoulders, leg, and feet. *Id.* She stated she could not turn her neck far to the left. Tr. at 66. She stated she had migraine headaches every two weeks that lasted for two days to two weeks. *Id.* She claimed she experienced pain and cramping in her hands due to carpal tunnel syndrome. Tr. at 65. Plaintiff testified that she had been diagnosed with congestive heart failure, which caused fluid retention and required her to elevate her feet for 30 minutes to an hour. Tr. at 66–67.

Plaintiff indicated she last saw Dr. Wicker three weeks before the hearing and had treated with her for a little over a year. Tr. at 47.

Plaintiff testified that she did not vacuum, sweep, mop, dust, or cook. Tr. at 43. Mr. Quarles and her son performed the household chores. Tr. at 44. Plaintiff denied using a computer, playing video games, going to movies, attending church, going to any other social or family gatherings, and participating in hobbies. Tr. at 44–45. Plaintiff stated that she read for about an hour each day and watched television for about two hours. Tr. at 45. She stated she was able to focus on what she read and watched. *Id.* She noted her sister

lived four houses away from her, whom she visited once a month when Mr. Quarles drove her. Tr. at 68.

Plaintiff testified she required assistance with bathing, dressing, and combing her hair. Tr. at 63, 65. She stated she tripped and fell one to three times per week. Tr. at 64. She stated she was unable to lift a half-gallon of milk, dropped things regularly, and had difficulty buttoning buttons. Tr. at 67–68.

b.     Witness's Testimony

Mr. Quarles appeared and testified on Plaintiff's behalf. Tr. at 69–72. He testified that he was living with Plaintiff. Tr. at 70. He stated he cooked for Plaintiff, drove for her, cooked her meals, washed her clothes, administered her medications, cleaned her home, bought her groceries, and paid her bills. Tr. at 69. He also accompanied her to doctor's visits and helped her to dress. Tr. at 71.

Mr. Quarles indicated he received disability benefits from social security. Tr. at 69. The ALJ asked him if those activities presented problems to him since he was disabled. *Id.* He responded that they were difficult at times because he had rheumatoid arthritis ("RA"). *Id.*

Mr. Quarles testified Plaintiff was either in pain or sleeping constantly and she slept for at least eight hours during the day. Tr. at 71–72. He indicated her symptoms significantly worsened in 2007, after she was hit by a car. *Id.*

c.     Vocational Expert's Testimony

Vocational Expert ("VE") John Black reviewed the record and testified at the hearing. Tr. at 72–85. The VE categorized Plaintiff's PRW as a cutter machine operator,

*Dictionary of Occupational Titles* ("*DOT*") number 699.685-014, as light with a specific vocational preparation ("SVP") of 2 and as a glove turner and former, *DOT* number 583.686-018, as light with a SVP of 2. Tr. at 73–74.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; could sit without limitation during an eight-hour workday; could stand and/or walk for up to four hours in an eight-hour workday; could occasionally climb ramps/stairs and stoop; could not balance, kneel, crouch, crawl, or climb ladders/ropes/scaffolds; would need to alternate between sitting and standing, but would not be off task; could perform no overhead reaching with the bilateral upper extremities; and could understand, remember, and carry out simple instructions and perform simple, routine tasks as consistent with unskilled work. Tr. at 75. The VE testified that the hypothetical individual could perform Plaintiff's past work as a glove turner and former. Tr. at 75–76. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified jobs as a photo counter clerk, *DOT* number 249.366-010, with 88,000 jobs nationally and 1,000 jobs in South Carolina; a mail clerk, *DOT* number 209.687-026, with 117,000 jobs nationally and 1,500 jobs in South Carolina; an order clerk, *DOT* number 209.567-014, with 138,000 jobs nationally and 1,600 jobs in South Carolina; and a bill sorter, *DOT* number 209.687-022, with 64,000 jobs nationally and 14,000 jobs in South Carolina. Tr. at 76–77.

The ALJ posed a second hypothetical in which she described a hypothetical individual of Plaintiff's vocational profile who would be limited as described in the first

hypothetical except that the person could only stand and/or walk for two hours in an eight-hour workday. Tr. at 77. She asked which of the jobs cited in response to the first hypothetical could still be performed. *Id.* The VE stated that all the jobs previously identified could be performed either seated or standing, including that of glove turner. Tr. at 78–79.

The ALJ asked which of the jobs identified in response to the first hypothetical could be performed if the hypothetical individual were required to elevate her legs for one-third of an eight-hour workday. Tr. at 79. The VE testified that the individual could perform jobs as a glove turner, a mail clerk, an order clerk, and a bill sorter. Tr. at 79–80.

The ALJ asked if the hypothetical individual could perform any jobs if she were physically off-task for one-third of an eight-hour workday. Tr. at 80–81. The VE testified that such a restriction would eliminate full-time work. Tr. at 81.

Plaintiff's attorney asked the VE if the individual could perform the jobs identified in response to the earlier questions if she were limited to lifting 10 pounds. *Id.* The VE indicated that all of the jobs identified earlier could be performed, with perhaps the exception of the glove turner position. Tr. at 81–82.

Plaintiff's attorney asked the VE if there would be any jobs available if the individual were absent more than four days per month. Tr. at 82. The VE stated more than two absences per month on a consistent basis would eliminate employment. *Id.*

Plaintiff's attorney asked the VE to assume the restrictions indicated in the ALJ's hypothetical questions, but to assume that the individual would need three unscheduled breaks daily for 20 minutes each time. Tr. at 84. She asked if that would eliminate any of

the jobs previously identified. *Id.* The VE stated the individual would not be employable.

Tr. at 84–85.

### 2.    The ALJ's Findings

In her decision dated May 4, 2012, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since March 28, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: diabetes mellitus; peripheral neuropathy; and adhesive capsulitis of shoulder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant is capable of performing a wide range of light work as defined in the Dictionary of Occupational Titles (D.O.T.) and Social Security Rules and Regulations with the ability to occasionally lift and/or carry up to 20 pounds, as well as, lift/carry 10 pounds frequently. This includes sedentary work as defined in D.O.T. and Social Security Rules and Regulations. The claimant has no limits for sitting in an eight-hour workday. She is capable of standing and/or walking for up to four hours in an eight-hour workday. She is able to perform occasional postural functions of climbing ramps/stairs and stooping. She is to perform no balancing, no kneeling, no crouching, no crawling, and no climbing of ladders/ropes/scaffolds. In the course of work, she should be allowed the ability to optionally alternate between sitting and standing, but such would not cause her to be off-task. She is to perform no overhead reaching with the bilateral upper extremities. Secondary to her non-severe mental impairment and in the abundance of caution, she retains the capacity to understand, remember and carryout simple instructions and perform simple routine tasks as consistent with unskilled work. The claimant is able to perform sustained work activity on a regular and continuous basis for eight hours per day, forty hours per week.

6.    The claimant is capable of performing past relevant work as a glove turner and former as performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 28, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 16–27.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to accord adequate weight to the opinions of Plaintiff's treating physicians;

2)    the ALJ failed to consider the combined effects of Plaintiff's impairments;

3)    the ALJ's RFC assessment was not supported by substantial evidence; and

4)    the ALJ did not adequately assess Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Physician's Opinion

Plaintiff argues that the ALJ failed to properly weigh and consider Dr. Wicker's opinion. [ECF No. 18 at 7]. Plaintiff submits, based on the VE's testimony, there would

be no jobs Plaintiff could perform if she were limited as specified in Dr. Wicker's opinion. *Id.* at 9.

The Commissioner argues that the ALJ discounted elements of Dr. Wicker's opinion that were inconsistent with the record as a whole. [ECF No. 20 at 16]. The Commissioner maintains that the ALJ did not disregard all of Dr. Wicker's opinion and incorporated some of her restrictions into the assessed RFC. *Id.* at 17.

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001).

Even if a treating physician's opinion is not accorded controlling weight, it is still entitled to deference and must be weighed according to the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). SSR 96-2p. The ALJ should consider "all of the following factors" to determine the weight to be accorded to the medical opinion:

examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole, specialization of the medical source; and other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). *See also Johnson*, 434 F.3d at 654.

The ALJ accorded little weight to Dr. Wicker's opinion because her opinion was "inconsistent with the record as a whole." Tr. at 23. The ALJ further explained that Plaintiff's gait and station were generally noted as normal and there was no evidence she was unable to walk. *Id.* She noted that Plaintiff's complaints of leg pain were sparse since starting Neurontin and the record contained very few references to chronic fatigue. *Id.*

The undersigned recommends a finding that the ALJ failed to evaluate Dr. Wicker's opinion as required by 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ provided sufficient reasons for her to decision not to accord controlling weight to Dr. Wicker's opinion. However, her decision does not reflect consideration of all factors that must be considered when weighing a medical opinion. The ALJ's explanation addressed the supportability and consistency of the opinion and she acknowledged the examining and treatment relationship between Plaintiff and Dr. Wicker when she stated Dr. Wicker was "one of the physicians that has treated the claimant." *See* Tr. at 23. However, the ALJ neglected to discuss the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship. Plaintiff was examined by Dr. Wicker eight times between June 23, 2011, and January 10, 2012, for uncontrolled blood sugar, edema, tiredness, confusion, neck pain, shoulder pain, and

32

chest pain. *See* Tr. at 713–17, 718–21, 726–28, 730–33, 753–56, 767–69, 770–73, 774–76. Plaintiff also saw other physicians in Dr. Wicker's practice on five occasions during that six-and-a-half month period. *See* Tr. at 734–37, 743–46, 748–51, 757–60, 762–65. Dr. Wicker's opinion was based on Plaintiff's frequent treatment, which averaged two visits to Dr. Wicker's office per month. Pursuant to 20 C.F.R. §§ 404.1527(c)(2)(i) and 416.927(c)(2)(i) "[t]he more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." Because greater weight should be given to the opinion of a physician who examined a claimant more frequently, the ALJ's failure to consider this factor renders her consideration of Dr. Wicker's opinion incomplete.

## 2.    Combined Effect of Impairments

Plaintiff argues that the ALJ failed to consider the combined effect of Plaintiff's impairments. [ECF No. 18 at 10]. Plaintiff submits that the ALJ neglected to consider the combined effects of sciatic pain; shoulder, arm, and fingering limitations; fatigue from anemia; and lower extremity edema, shortness of breath and fatigue from congestive heart failure. *Id.*

The Commissioner argues that the ALJ stated that she consider the entire record and the combined effects of Plaintiff's impairments. [ECF No. 20 at 12]. The Commissioner further maintains that even if the ALJ failed to properly consider the combined effects of Plaintiff's impairments, such error was harmless because she would have reached the same conclusion notwithstanding her error. *Id.* at 15.

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The ALJ wrote the following:

In sum, the undersigned determined that because of the claimant's diabetes and peripheral neuropathy, she is limited to light work and she can stand for up to four hours in a normal workday with the postural limitations set forth herein. Furthermore, because of shoulder problems, the undersigned concluded that the claimant should perform no overhead reaching with her arms. Finally, due to her depression, the undersigned concluded that the claimant maintains the capacity to perform unskilled work on a full-time basis.

Tr. at 24.

In *Walker*, the ALJ engaged in an analysis similar to that of the ALJ in this case. Like this ALJ, "[a]fter finding that clamant failed to meet a listing, the ALJ went on to

discuss each of claimant's impairments but failed to analyze the cumulative effect the impairments had on the claimant's ability to work." *Walker*, 889 F.2d at 49. Here, the ALJ discussed Plaintiff's alleged impairments that included congestive heart failure, history of tachycardia, gastritis, migraines, hypertension, anemia, and depression, but concluded that these impairments were not severe. Tr. at 17–18. She concluded that diabetes mellitus, peripheral neuropathy, and adhesive capsulitis of the shoulder were severe impairments. Tr. at 16. Then, she assessed an RFC for light work that required no more than four hours of standing based on diabetes and peripheral neuropathy, limited Plaintiff to no overhead reaching based on her shoulder impairment, and restricted her to unskilled work based on depression. *See* Tr. at 24. The ALJ failed to explicitly consider the combined effects of Plaintiff's severe impairments in assessing her RFC and neglected to consider or impose restrictions based on the effects of her non-severe impairments, with the exception of depression.

The Commissioner encourages the court to overlook the ALJ's omission and cites several cases, including *Singleton v. Astrue*, C/A No. 0:10-2540-SB-PJG, 2011 WL 7641360 (D.S.C., Nov. 30, 2011), *Thornsberry v. Astrue*, C/A No. 4:08-475-HMH-TER, 2010 WL 146483 (D.S.C. Jan. 12, 2010), and *Ingram v. Astrue*, C/A No. 3:07-823-GRA, 2008 WL 3823859, at *2 (D.S.C. Aug. 12, 2008), in which this court has concluded that an explicit consideration of the combined effects of a claimant's impairments did not warrant remand where the ALJs' findings suggested they considered the combined effects of the claimants' impairments. In the instant case, the ALJ stated the following regarding the combined effects of Plaintiff's impairments: "when acting in combination,

35

these impairments imposed more than minimal limitation on the claimant's ability to work" and "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Tr. at 16, 18. However, this court has held that such conclusory statements are not sufficient to prove that the ALJ considered the combined effects of a plaintiff's impairments in determining her RFC. *See Good v. Colvin*, C/A No. 1:12-3380-RMG, 2014 WL 358425 (D.S.C. Jan. 31, 2014) (holding that the ALJ inadequately considered the combined effects of the plaintiff's impairments where the ALJ included no findings to suggest he was considering the combined effects of the plaintiff's impairments other than boilerplate language); *see also Lucas v. Astrue*, C/A No. 5:10-2606-JMC-KDW, 2012 WL 265712, at *14 (D.S.C. Jan. 23, 2012), *aff'd*, 2012 WL 266480 ("[E]ven if such boilerplate verbiage could suffice to demonstrate the ALJ considered all of Plaintiff's impairments, it does not purport to indicate he considered all impairments in combination."). Based on the Fourth Circuit's rationale in *Walker* and this court's rationale in *Good*, *Lucas*, and *Saxon*, the undersigned recommends a finding that the ALJ failed to adequately consider the combined effects of Plaintiff's impairments.

### 3.    RFC Analysis and Credibility

While Plaintiff raises separate issues regarding the ALJ's RFC assessment and her credibility determination, the undersigned finds it appropriate to consider these issues together. Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to consider her pain and the side effects of her medications. [ECF No. 18 at 11]. Plaintiff contends the ALJ failed to properly

evaluate her credibility and did not provide sufficient reasons for rejecting her testimony. *Id.* at 13. Plaintiff maintains that the ALJ equated her treatment noncompliance with her credibility and neglected to consider her reasons for noncompliance. *Id.* at 14.

The Commissioner argues that the ALJ properly relied on the opinions of the state agency physicians and psychologists in determining Plaintiff's RFC. [ECF No. 20 at 16]. The Commissioner argues that the ALJ had an adequate basis for discounting Plaintiff's complaints. *Id.* at 19. The Commissioner maintains that the ALJ did not consider Plaintiff's problems in obtaining medication negatively in determining her RFC, but appropriately considered that Plaintiff's medical records did not reflect the severity of the impairments that she alleged in her testimony. *Id.* at 20.

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the

intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Pursuant to SSR 96-8p, the RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule, describe the maximum amount of each work-related activity the individual can perform based upon the evidence in the case record, and resolve any material inconsistencies or ambiguities in the evidence. *Id.*

The ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." Tr. at 22. She went on to provide "[w]hen medical signs and laboratory findings do not substantiate any physical impairment capable of producing the alleged pain, as is the case in the instant matter, and other symptoms (and a favorable determination cannot be made on the basis of the total record), the possibility of a mental impairment as the basis for the pain should be investigated." *Id.* The ALJ then concluded that Plaintiff's non-severe mental impairment was not the basis for her complaints of pain. *Id.* The ALJ further indicated "medical signs and laboratory findings do not substantiate any physical impairment capable of producing the alleged pain" and "[t]he claimant's treatment history detracts from her credibility." *Id.*

The ALJ provided two contradictory statements regarding whether Plaintiff's underlying impairments could cause the alleged pain. First, she included the typical boilerplate language that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." *See* Tr. at 22. Then, she stated the opposite, indicating "medical signs and laboratory findings do not substantiate any physical impairment capable of producing the alleged pain." *See Id.* This error is material because the analysis hinges significantly upon whether Plaintiff has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, including pain. *See* 20 C.F.R. § 404.1529(b). If Plaintiff has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ is required to consider all of her symptoms, but if Plaintiff does not, all of her alleged symptoms do not have to be considered.

The ALJ concluded that Plaintiff's severe impairments included diabetes mellitus, peripheral neuropathy, and adhesive capsulitis of the shoulder. Tr. at 16. According to the U.S. National Library of Medicine, which is maintained by the National Institutes of Health, peripheral neuropathy is nerve damage that may affect a single nerve, a nerve group, or nerves in the whole body. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. Peripheral neuropathy; [updated 2012 Aug. 26; cited 2014. Oct. 30]. Available from http://www.nlm.nih.gov/medlineplus/ency/article/

000593.htm.[3] Pain and numbness are typical symptoms of peripheral neuropathy and symptoms typically begin in the feet and toes, but may progress to the legs and arms. *Id.* Deep pain may also be present. *Id.* Adhesive capsulitis, more commonly known as frozen shoulder, is inflammation in the capsule of the shoulder joint that prevents the shoulder bones from moving freely in the joint. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. Frozen shoulder; [updated 2012 Nov. 15; cited 2014 Oct. 30]. Available from http://www.nlm.nih.gov/medlineplus/ency/article/ 000455.htm. Plaintiff was diagnosed with medically-determinable impairments that the ALJ found to be severe and that were capable of producing the alleged pain. Therefore, the ALJ erred in stating that medical signs and laboratory findings did not substantiate the presence of a physical impairment that could produce the alleged pain.

Because Plaintiff had medically-determinable impairments that could reasonably be expected to produce the alleged symptoms, the ALJ was required to consider all the record evidence regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms and the extent to which they restricted her ability to perform basic work activities. *See* 20 C.F.R. § 404.1529. While the ALJ explained that she discounted Plaintiff's testimony because it was not supported by medical signs, laboratory findings, and Plaintiff's treatment history, the ALJ failed to address some of Plaintiff's complaints that were substantiated by evidence in the record.

---

[3] A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

The ALJ neglected to consider the type, dosage, and side effects of Plaintiff's medications. Although Plaintiff was prescribed substantial dosages of multiple medications, the ALJ failed to address her medications, except to the extent that she indicated Plaintiff's condition was well-controlled on medication and that there was no evidence of fatigue caused by medication. *See* Tr. at 21, 23. The record reflects that between April 2008 and October 2011, Plaintiff's Lantus insulin dosage was increased from 65 units, two times daily to 42–45 units, four times daily. *See* Tr. at 626, 737. The dosages of Plaintiff's diabetes medications were increased at multiple physicians' visits to compensate for uncontrolled blood sugars. *See* Tr. at 301, 306, 566, 600, 612, 614, 617, 620, 626, 634, 737, 743, 746. Plaintiff was initially prescribed Neurontin 300 mg, three times daily for peripheral neuropathy, but her dosage was increased to five times daily to address her symptoms. *See* Tr. at 301, 303. Plaintiff was also prescribed Lortab and Ultram for pain. *See* Tr. at 671, 751. The medications list submitted by claimant prior to the hearing indicates Plaintiff was taking ten prescription medications and that several of them were taken as many as five times per day. *See* Tr. at 253. The ALJ disregarded Plaintiff's testimony that she would sleep for up to eight hours after taking her nerve medication. *See* Tr. at 63. The ALJ stated the record contained only one reference to Plaintiff complaining of fatigue in March 2010 that her physician indicated was a grief reaction. Tr. at 23. While the undersigned's review of the record does not reveal frequently documented complaints of sleepiness or fatigue caused by medications, the record does contain multiple indications from Plaintiff in function reports that she experienced fatigue and sleepiness as side effects of prescribed medications. *See* Tr. at

201, 208, 217, 241, 242. The undersigned also notes that Plaintiff complained to Dr. Wicker of tiredness in November 2011. Tr. at 726. The ALJ's failure to consider the type, dosage, and side effects of Plaintiff's medications cannot be overlooked in the presence of such evidence.

The ALJ also neglected to address measures used to relieve symptoms by not considering evidence of lower extremity edema and Plaintiff's alleged need to elevate her legs. *See* Tr. at 66–67. Lower extremity edema was observed at multiple treatment visits. *See* Tr. at 286 (trace lower extremity edema), 295–96 (1+ bilateral edema to mid-shin), 312 (1+ pitting edema), 319 (1+ edema in calf area), 625 (2+ pitting edema, worse on left), 629 (2+ pitting edema bilaterally), 650 (2+ edema in calves), and 716 (trace pitting edema in bilateral ankles). Dr. Wicker indicated that Plaintiff required the ability to elevate her legs. Tr. at 597. Plaintiff was also prescribed Lasix[4] and its dosage was increased to address Plaintiff's symptoms. *See* Tr. at 296, 320, 630.

The undersigned recommends a finding that the ALJ erred in her assessment of Plaintiff's credibility to the extent that she failed to adequately consider Plaintiff's subjective symptoms. However, the undersigned does not find that the record suggests that the ALJ discounted Plaintiff's credibility based on her financial inability to obtain prescribed medications. While the ALJ cited Plaintiff's inability to obtain medications in

---

[4] According to the U.S. National Library of Medicine, Lasix is the brand name for Furosemide, which is a medication prescribed to reduce swelling and fluid retention caused by various medical problems. AHFS Consumer Medication Information [Internet]. Bethesda, MD: American Society of Health-System Pharmacists, Inc.; ©2014. Furosemide; [updated 2010 Sept. 1; cited 2014 Oct. 30]. Available from http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html.

her recitation of Plaintiff's medical history and indicated that her treatment history detracted from her credibility, it appears that the ALJ's credibility determination was based on the objective findings and documented complaints in Plaintiff's medical records. *See* Tr. at 22. Nevertheless, because the ALJ erred in assessing Plaintiff's subjective symptoms, Plaintiff's credibility should be reassessed upon remand.

The undersigned recommends a finding that the ALJ erred in assessing Plaintiff's subjective symptoms, thus, leading her to err in determining Plaintiff's RFC. The record suggests additional limitations, as discussed above, that the ALJ failed to address. Therefore, the RFC assessed by the ALJ does not comply with the requirements of SSR 96-8p in that it fails to assess Plaintiff's ability to work in an ordinary work setting on a regular work schedule and to describe the maximum amount of each work-related activity Plaintiff can perform based upon the evidence in the case record.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

October 30, 2014                              Shiva V. Hodges
Columbia, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).